DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Charles W. Riley, et al., | ) | |
| | ) | CASE NO. 1:11 CV 1150 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| KeyCorp, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## I.  INTRODUCTION

This breach of contract case is presently before the Court on cross-motions for Rule 12

dismissal.  Briefly, defendant KeyCorp purchased a financial management firm, Austin Capital

Management (ACM) from plaintiffs pursuant to a purchase and sale agreement (PSA) in 2006.

KeyCorp purchased ACM for an "aggregate price" of $35 million dollars at closing, and a future

"Contingent Consideration," the payment and amount of which are subject to certain conditions

under the PSA.

KeyCorp has operated ACM in a manner which plaintiffs allege is contrary to the terms

of the PSA and has not paid plaintiffs the Contingent Consideration.  Plaintiffs allege in Count 1

of the complaint that KeyCorp has breached the PSA by not paying the Contingent

Consideration.  In Count 2,[1] plaintiffs allege that KeyCorp breached the PSA's implied duty of

---

[1] ECF 1, par. 80: KeyCorp breached the implied covenant of good faith and fair dealing
when it liquidated the Funds. . . . KeyCorp took opportunistic advantage of ACM when it
liquidated the Funds to appease certain client-consultants.  KeyCorp also breached the implied
covenant of good faith and fair dealing by causing the Liquidation as part of its plan to argue that
(continued...)

(1:11 CV 1150)

good faith and fair dealing when it liquidated ACM's funds in 2009, and by causing the

liquidation as part of a plan not to pay plaintiffs' Contingent Consideration.  And in Count 3,[2]

plaintiffs allege that KeyCorp breached the PSA's implied duty to employ reasonable efforts to

generate revenues for ACM.  ECF 1.

In its amended counterclaim,[3] KeyCorp seeks a declaration that: 1) (a) a "material

adverse effect" occurred under the PSA which excuses KeyCorp's payment of Continent

Consideration, or alternatively, (b) any Contingent Consideration to which plaintiffs may be

entitled must be calculated on ACM's actual revenues during the Measurement Period; 2)

plaintiffs have accepted as accurate KeyCorp's statement of revenues earned by ACM during the

Measurement Period; 3) liquidation of ACM's funds and cessation of operations was proper

under the PSA; and 4) to the extent KeyCorp has any liability to plaintiffs, that liability is limited

under the PSA to $12.5 million.  ECF 24.

Defendant KeyCorp has moved to dismiss Counts 2 and 3 of the complaint pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which

relief can be granted.  ECF 15.  Plaintiff has opposed the motion (ECF 28) and defendant has

replied (ECF 33).

---

[1](...continued)
it did not have to pay the Contingent Consideration.

[2] ECF 1, par. 87: KeyCorp breached this implied duty in the PSA [to employ reasonable efforts to generate revenues] by causing an unnecessary and unreasonable liquidation of ACM's Funds.

[3] Defendant voluntarily dismissed its third-party complaint.  ECF 50.  Plaintiffs' motion to dismiss or strike defendant's third-party complaint is moot and the Court will only consider plaintiffs' motion as to defendant's counterclaims.

2

(1:11 CV 1150)

Also pending before the Court is plaintiffs' motion to pursuant to Rules 12(b)(6) and 12(f) to strike or dismiss defendant KeyCorp's counterclaims.  ECF 29.  KeyCorp has opposed plaintiffs' motion (ECF 34) and plaintiff has replied (ECF 35).

For the reasons contained herein, defendant's Rule 12(b)(6) motion to dismiss Counts 2 and 3 of plaintiffs' complaint is DENIED.

Further for the reasons contained herein, plaintiffs' Rules 12(b)(6) and 12(f) motion to dismiss or strike defendant's counterclaims is DENIED.

## II.  FACTS

**The facts summarized below are as alleged in plaintiffs' complaint.**

A.     <u>Sale of ACM to KeyCorp</u>

Plaintiffs in this case formed ACM in 1993, a company which managed various investment funds.  According to the complaint, ACM became "one of the most successful and respected fund-of-fund asset managers in the United States."  By 2006, ACM had almost $900 million dollars under management.  ECF 1, par. 2 and 10.

As an asset manager, ACM created various investment products that were managed by fund managers.  ACM's investment funds were diversified with thirty-five different managers so that no more than 7.5 % of funds were managed by a single manager.  ECF 1, par. 10.

KeyCorp acquired ACM from plaintiffs in 2006 pursuant to a Purchase and Sale Agreement (PSA).  Prior to acquisition, KeyCorp performed extensive due diligence of ACM's business, including current investments and past investment losses.  Among the investments upon which KeyCorp performed due diligence was ACM's investment in a fund managed by

3

(1:11 CV 1150)

Tremont Partners, Inc, a Madoff feeder fund, which at the time was approximately a $50 million

or 5% position for ACM's funds. In addition, ACM's personnel "were careful to explain to

KeyCorp" about "severe losses" suffered by ACM in 2002 as a result of its investment in a fund

managed by Beacon Hill Asset Management, which was revealed to be a "massive fraud." ECF

1, par. 12-13.

      KeyCorp paid plaintiffs $35 million at closing for ACM on April 1, 2006. The PSA also

provided for the possibility of another payment after five years, subject to various terms and

conditions set out in the PSA, which included the financial performance of ACM during a five

year period after closing.[4] ECF 1, par. 14 and 17.

      The plaintiffs and certain key ACM employees entered into employment agreements with

KeyCorp and Victory Capital Management (Victory) to continue to work for ACM after the

closing. Victory was a subsidiary of KeyCorp, and KeyCorp's in-house investment management

firm. Post-closing, plaintiffs reported to the chief executive officer of Victory, and KeyCorp,

through Victory, controlled ACM. ECF 1, par. 11, 17 and 18.

      At the time of the sale of ACM to KeyCorp, Victory had approximately $56 billion in

managed assets and accounts. ACM's assets[5] continued to grow after acquisition by KeyCorp.

---

[4] "[I]f ACM's net revenues during the Measurement Period exceeded $93 million, the
Back-end Payment would increase incrementally, up to $60 million at net revenues over
$200.000. Conversely, the Back-end Payment decreased incrementally at revenue targets less
than $93 million and was reduced to zero if net revenues failed to reach $35 million during the
Measurement Period." ECF 1, par. 15.

[5] Plaintiffs' complaint frequently describes ACM's funds as ACM's "assets" and
therefore the Court, for the purposes of this factual summary, will use the same nomenclature.

4

(1:11 CV 1150)

By the end of the third quarter of 2008, ACM's assets under management grew to about $2.8 billion.  ECF 1, par. 18 and 19.

B.      Financial Market Declines

"In late 2008, the worldwide financial system began to crumble. . . . In early October 2008, alone, the S & P 500 lost 22% of its value in six consecutive trading sessions. . . . On December 11, 2008, in the midst of persistent falling markets, the world learned that Bernard Madoff had been running a multibillion-dollar Ponzi scheme through his investment company, Bernard L. Madoff Securities LLC."[6]

At that time, ACM's funds had about 7.5 % of the funds' assets invested in the Rye Select Broad Market Prime Fund (Rye Fund).  The Rye Fund was managed by Tremont Partners, Inc. (Tremont).[7]  Tremont had retained Madoff to invest the assets of the Rye Fund.  ECF 1, par. 21.

As a consequence of Madoff's crimes, financial markets experienced significant losses.  In 2008, the S & P 500's annual returns were down 41%, and the Dow Jones' annual returns were down 36%.  ACM's funds also experienced losses as a consequence of Madoff, but those losses were less than the financial markets in general.  ACM's largest funds experienced

_____

[6] ECF 1, par. 20-21.

[7] "Tremont was considered by many to be the leading hedge fund management and consulting firm in the world. . . .[ACM's f]unds' investment with Tremont pre-dated the sale to KeyCorp by almost a decade and all aspects of Tremont's management was fully disclosed to and examined by KeyCorp during pre-sale due diligence."  ECF 1, par. 21-22.

(1:11 CV 1150)

negative returns of -23% in 2008, and ACM's smaller funds experienced negative returns of -26%.[8]

Paragraphs 24 - 26 of plaintiffs' complaint describes the overall effect of Madoff's crimes on ACM,  financial markets, and the hedge-fund industry:

> 24.     In short, because if its highly diversified investment strategy, the Madoff Losses were not material to ACM's business, operations, assets or financial conditions.
> 25.     Nonetheless, in 2008, market losses and Madoff's scheme reverberated throughout the hedge-fund industry, contributing to more funds shutting down than opening in both 2008 and 2009.  The Wall Street Journal called 2008 the worst year for hedge funds since 1990, attributing the underlying cause to "falling markets and record redemption requests."  According to Hedge Fund Research, Inc., investors withdrew a record $155 billion from the hedge-fund industry in 2008, only the second time in which the industry experienced a net outflow of investor capital over a full-year period.  Various media outlets covering the hedge fund industry attributed the exodus of funds from the hedge-fund industry to market losses and the reputational damage inflicted by the Madoff Ponzi scheme.
> 26.     In sum, Madoff's schemes harmed the reputation of the entire hedge-fund industry.

ECF 1.

While AMC's funds experienced losses, ACM "fared better than many, if not most, of their peers."  ECF 1, par. 27.  "Victory's traditional investments, on the other hand, performed far worse that [sic] ACM's Funds, producing bleak returns roughly on par with the broader securities markets.  For example, Victory's 'Institutional Diversified Stock' Fund produced a total return of -37.16% in 2008; Victory's 'Large Cap Growth A' Fund had a total return of -44.74%."  ECF 1, par. 28.

---

[8] ECF 1, par. 23.

(1:11 CV 1150)

C.      Investor and KeyCorp Responses to Financial Market Declines

Plaintiffs' complaint describes how the investors in the ACM funds became increasingly

concerned about the continued declines in their investments and desired to redeem their interests

in the ACM funds.

> 29.      In late December, investors in the [ACM] Funds (the "Fund Investors"),
> along with the general investing public, became increasingly concerned about continued
> declines in their investments. Given the prevailing market uncertainty, a number of Fund
> Investors indicated that they desired to redeem their interests in the Funds. Many Fund
> Investors, however, were still subject to a one-year lockup period during which no
> redemption was allowed. Thus, only Fund Investors no longer subject to the lockup
> could redeem their interest at the next-quarter-end and even these longstanding investors
> were required to give 65 days' advance notice of their intent to redeem. Still, overriding
> the redemption rights of all Fund Investors, ACM could, at any time and in its sole
> discretion, suspend fund redemptions altogether.
>
> 30.      The unilateral discretion to suspend redemptions is a power given to most
> hedge fund managers. During the grim markets of late 2008 and 2009, when investor
> confidence (along with market indices) remained persistently low, many hedge fund
> managers invoked this power to prevent an irrational flurry of panic-driven redemptions.
> Often, by the time markets recover, hedge fund performance has improved and
> previously disgruntled investors find themselves no longer desiring to redeem their
> interests.

ECF 1.

Plaintiffs were confident that ACM could weather the grim financial market and

advocated for KeyCorp to suspend redemptions in ACM's funds until the financial storms had

passed. Plaintiffs made these recommendations based on their prior experience in 2002 with

losses resulting from fraud by an ACM investment fund manager, Beacon Hill. ACM recovered

from the Beacon Hill fraud, and plaintiffs were confident that ACM could also recover from the

losses triggered by the Madoff fraud. ECF 1, par. 31. Many of ACM's largest and longest-

7

(1:11 CV 1150)

standing investors also expressed confidence in ACM and stated their intention to keep their

investments in ACM.  ECF 1, par. 32.

> However, KeyCorp did not share plaintiffs' confidence.

> 33.    But from the beginning of its relationship with ACM, KeyCorp had been
> wary of hedge-fund investors and the risk associated with their investment strategies.
> Thus, following the Madoff Losses, KeyCorp and Victory were angry that ACM linked
> their names to Madoff and wanted nothing other than to disassociate with AMC.  Further,
> Victory's clients and client-consultants (collectively, the "Victory Clients") began
> indicating they did not share the confidence of ACM's legacy investors.  After ACM's
> sale to KeyCorp, many longstanding Victory Clients began investing in ACM's funds.
> These Victory Clients, as more recent ACM investors, had made their investment with
> ACM at the height of the market.  Therefore, many of these Victory Clients wanted out
> of [ACM's] Funds - they had experienced all the market turmoil and the Madoff Losses,
> but not all of the dramatic success that preceded it in the 2006 to 2007 time frame.
> Consequently, Victory temporarily suspended some [ACM] Fund redemptions while
> determining how to move forward.

ECF 1.

However, KeyCorp discontinued suspending redemptions and instead, by letter dated

January 26, 2009, KeyCorp gave ACM Fund Investors two choices going forward: (i) agree to a

new one-year lockup and receive a discounted management fee; or (ii) redeem their interest in

the ACM Funds, regardless of any pre-existing lockup.  "With market sentiment what it was in

the first quarter of 2009 and the increasing desire for redemptions throughout the hedge-fund

industry, KeyCorp's forcing of a new, artificial lockup period for all non-redeeming investors . .

. only added momentum to a growing interest [to redeem positions in ACF funds]."  ECF 1, par.

35.  However, investors representing about one-third of the assets under ACM management were

willing to maintain their positions in ACM funds despite the "artificial lockup."   ECF 1, par. 38.

8

(1:11 CV 1150)

Plaintiffs allege that in the spring of 2009,[9] KeyCorp and Victory determined that ACM had suffered a "material adverse effect" on its business, and that KeyCorp's correspondence with ACM fund investors sought to gain acknowledgment that ACM had suffered a material adverse effect, all in order to avoid making the possible payment to plaintiffs contemplated by the PSA based on revenues five years after KeyCorp's acquisition of ACM.  See ECF 1, par. 39. Plaintiffs' disputed KeyCorp's conclusion that ACM had suffered a material adverse effect, pointing out that in the spring of 2009, ACM still had over $2 billion in assets under management, had just earned over $6 million in net revenues for the first quarter of 2009, and had many investors who were willing to retain their investments with ACM.   ECF 1, par. 40.

Notwithstanding plaintiffs' efforts to persuade KeyCorp to the contrary, KeyCorp decided to liquidate ACM's funds and wind down ACM's affairs.  ACM notified its investors of this decision by e-mail dated May 5, 2009.  The e-mail stated that:

> "The decision to liquidate the Funds is based on our determination that given the level of assets under management, we believe it would be difficult to continue to make the appropriate investments in our firm (people, technology, etc.) to ensure its long-term survival and difficult to continue to properly manage the Austin Capital Funds and fulfill our obligations to our investors. . . . We are deeply saddened that the events following the discovery of the Madoff fraud on December 11, 2008 have led to this unfortunate turn of events."

ECF 1, par. 42.

Plaintiffs allege that KeyCorp "blamed" the Madoff fraud and ACM fund investors who decided to redeem their investments in the ACM funds in order to disassociate KeyCorp with

---

[9] Plaintiffs also alleged that as early as January 2009, KeyCorp had already determined that ACM had suffered a "material adverse effect" on its business.  See ECF 1, par. 40.

9

(1:11 CV 1150)

ACM and to serve as a pretext for KeyCorp's ultimate refusal to pay the Contingent Consideration contemplated by the PSA.  Plaintiffs alleged that the decision to liquidate ACM and ACM's funds was "unnecessary" and an "unreasonable and unwise product of KeyCorp's conflicted decision-makers."  ECF 1, par. 43.

Several lawsuits have been filed against ACM, the plaintiffs, KeyCorp and others in connection with the losses experienced by the ACM funds (Investor Litigation).  Most of the Investor Litigation was eventually consolidated into a multi-district litigation class action pending in the Southern District of New York.  Plaintiffs allege that KeyCorp has asserted a defense in the Investor Litigation that the Madoff losses were not material, and that this defense is contrary to the position taken by KeyCorp's position in the instant case that those same losses constitute a material adverse effect under the PSA which supports KeyCorp's decision not to pay the Contingent Consideration under the PSA.  ECF 1, par. 52-54.

By letter dated August 4, 2010, KeyCorp advised the plaintiffs that ACM's investments in a Madoff feeder fund "have clearly had a material adverse effect" and that the $100 million sought in the Investor Litigation, and the losses to ACM's funds due to the Madoff investments, resulted in KeyCorp's decision to liquidate ACM and the ACM funds, thereby "eliminating KeyCorp's obligation to pay any Contingent Compensation."  ECF 1, par. 54.[10]  It is plaintiffs' position that there had not been a "material adverse effect" on ACM's business that would eliminate KeyCorp's obligation to pay the Contingent Consideration under the PSA.  ECF 1, par. 55.

---

[10] The Court notes that there are two paragraphs numbered "54" in plaintiffs' complaint.

10

(1:11 CV 1150)

D.      Purchase and Sale Agreement

        The dispute in this case revolves around payment of the Contingent Consideration

provision of the Purchase and Sale Agreement between defendant KeyCorp and plaintiffs.

        Section 2.2 of the PSA provides for the Purchase Price for the KeyCorp acquisition of

ACM from plaintiffs:

        2.2     Purchase Price

                (a)     The aggregate price (the "Purchase Price") for all the Shares will be:
                        (i)     subject to the adjustment in accordance with Sections 2.2(b) and
                2.6 hereto, $34,000,000 (such amount, as adjusted in accordance with Sections
                2.2(b) and 2.6 hereto, the "Initial Purchase Price) . . . ; plus

                        (ii)    subject to the conditions set forth in Section 2.5(c), the amount
                determined in accordance with Section 2.5 (the "Contingent Consideration"),
                which amount shall be allocated among the Sellers in accordance with Section
                2.5(a).


        Section 2.5 of the PSA provides for the payment of Contingent Consideration.  That

section provides as follows:

        2.5     Contingent Consideration: Special Compensation Bonus Pool

        (a)  Subject to Section 2.5(e), within three Business Days after the final
        determination of the amount of the Contingent Consideration and the Special
        Bonus Pool Amount in accordance with Sections 2.5(c) and (d), the Buyer will (i)
        pay to the Sellers the portion of the Contingent Consideration allocable to each of
        them in accordance with Schedule 2.5(a)(i), if any, in each case by wire transfer
        of immediately available funds to an account or accounts which are designated by
        Sellers' Representative on behalf of each of them within two Business Days prior
        to the date of such payment, and (ii) create a compensation bonus pool (the
        "Special Compensation Bonus Pool") for certain employees of the Companies as
        of such date (each a "Designated Employee Recipient" and, collectively, the
        "Designated Employee Recipients") and pay from the Special Compensation
        Bonus Pool to such Designated Employee Recipients the portion of the Special
        Bonus Pool Amount allocable to each of them in accordance with Schedule

11

(1:11 CV 1150)

2.5(b)(ii), less any applicable Taxes; it being noted that such payments by the Buyer from the Special Compensation Payment Pool to the Designated Employee Recipients shall be treated as compensation for services rendered for U.S. federal income tax purpose.

(b)  The aggregate amount of Contingent Consideration shall be equal the amount set forth on Schedule 2.5(b)(i)[11] hereto which corresponds to a portion of the Five Year Net Revenues determined in accordance with Sections 2.5(c) and (d) for the five-year period beginning on the Closing Date (the "Measurement Period").  The aggregate amount of the Special Compensation Bonus Pool (the "Special Bonus Pool Amount") shall equal the amount set forth on Schedule 2.5(b)(ii) hereto which corresponds to a portion of the Five Year Net Revenues determined in accordance with Sections 2.5(c) and (d) for the Measurement Period.

. . .

(e)  The Buyer's obligation to pay any Contingent Consideration or any amounts from the Special Compensation Bonus Pool shall, in each case, be subject to the conditions that (i) the Closing shall have occurred and (ii) no event shall have occurred or circumstances exist during the final twelve weeks of the Measurement Period that has had, or is reasonably likely to result in, a Material Adverse Effect.[12]

---

[11] Schedule 2.5(b)(i) to the PSA is a table which correlates Five Year Net Revenues on a sliding scale with the Aggregate Amount of Contingent Consideration.  At the high end of Five Year Net Revenues of $200,000,000 or more, the Aggregate Amount of Contingent Consideration is stated as $32,076,000.  At the low end of Five Year Net Revenues of $35,000,000 or less, the Aggregate Amount of Contingent Consideration is $0.

[12] The PSA defines a Material Adverse Effect in "Annex A - Definitions" as follows:

"Material Adverse Effect" means an event or events, whether individually or taken together, which have a material adverse effect upon or which the cumulative effect of which is to have a material adverse effect upon the business, operations, assets or financial condition of the Companies taken as a whole; provided, however, that Material Adverse Effect shall exclude any change or effect due to general economic, securities markets or hedge fund industry-wide conditions.

(1:11 CV 1150)

Section 11.8(a) of the PSA addresses the future operations and performance of ACM

after acquisition by KeyCorp as follows:

11.8   Future Operations and Performance

(a) Except as otherwise expressly set forth in this Agreement, neither the
Buyer nor any of its representatives has made, and the Sellers the Companies
and Sellers' Representative specifically disclaim reliance on, any representation,
warranty, agreement or other statement made by the Buyer or any of its
representatives with respect to how the Buyer shall operate the business of the
Companies [ACM], whether or how the Buyer shall maintain existing lines of
business or enter into new lines of business of the Companies or any other fact
that Sellers might deem material to their ability to earn any or all of the
Contingent Consideration or whether the Companies will meet or exceed financial
performance expectations.

(b) Except as otherwise expressly set forth in this Agreement, Sellers shall not be
deemed to have made any representation or warranty or agreed to any covenant or
obligation with respect to the future financial performance of the business of the
Companies.  Except as otherwise expressly set forth in this Agreement, neither
the Companies nor any of their representatives, including without limitation the
Sellers, has made, and the Buyer hereby specifically disclaims reliance on, any
representation, warranty agreement or other statement made by the Companies or
any of their representatives, including without limitation the Sellers, with respect
to any projections or other indications of future financial performance that the
Buyer might deem material to its acquisition of the Companies.

The parties disagree as to the meaning of the language of Section 11.8.  KeyCorp argues

that Section 11.8 constitutes plaintiffs' agreement that KeyCorp was free to operate ACM in any

manner it saw fit.  Plaintiffs contend that the language of Section 11.8 only reflects plaintiffs'

disclaimer as to extra-contractual representations by KeyCorp with respect to the operation of

ACM, and that the PSA is silent with respect to KeyCorp's obligations regarding the operation

of ACM during the Measurement Period.

13

(1:11 CV 1150)

Section 11.7 of the PSA addresses the agreement between the parties and schedules as follows:

> 11.7  Entire Agreement; Schedules
>
> This Agreement, including the Schedules, Exhibits, Annexes, certificates and documents referred to herein, and any agreements or other documents executed by the parties simultaneously herewith or pursuant thereto, constitute the entire understanding and agreement of the parties hereto with respect to the subject matter hereof and supersede all other prior agreements and understandings, written or oral, between the parties with respect to such subject matter.  The disclosure of any matter in the Schedules hereto shall not be deemed to constitute an admission by any party hereto, or to otherwise imply, that any such matter is material for purposes of this Agreement.

## III.  MOTIONS TO DISMISS

A.    <u>Defendant's Motion to Dismiss Counts 2 and 3 of Plaintiffs' Complaint</u>

Count 1 of plaintiffs' complaint alleges that KeyCorp breached the PSA because KeyCorp did not pay plaintiffs the Contingent Consideration on the grounds that the Madoff situation constituted a Material Adverse Effect on ACM.  KeyCorp has not moved to dismiss Count 1 of the complaint and that question is not before the Court on defendant's motion to dismiss Counts 2 and 3.

In Count 2, plaintiffs allege that the PSA includes an implied duty of good faith and fair dealing and that KeyCorp had a duty not to take opportunistic advantage of plaintiffs in a way that could not have been contemplated at the time of the PSA's drafting, and that KeyCorp breached that duty when it liquidated ACM's funds.  And in Count 3, plaintiffs allege that PSA imposed on KeyCorp an implied duty to generate reasonable revenues for ACM and that

14

(1:11 CV 1150)

KeyCorp breached that implied duty by causing the unnecessary and unreasonable liquidation of ACM's funds.

KeyCorp moves to dismiss Counts 2 and 3 of plaintiffs' complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.  KeyCorp advances two arguments in support of its motion.  First, KeyCorp argues that plaintiffs' claim for breach of implied duties should be dismissed because plaintiffs have already asserted a breach of contract claim in Count 1 and Ohio law does not recognize independent causes of action for breaches of implied duties separate from a claim for breach of contract.  Second, KeyCorp argues that plaintiffs' claims that KeyCorp breached its implied contractual duties by liquidating ACM's funds are contrary to the express language of the PSA, which gives KeyCorp the exclusive authority to manage ACM.[13]  ECF 15.

In opposing defendant's motion to dismiss Counts 2 and 3, plaintiffs argue that under Ohio law every contract contains an implied duty for the parties to act in good faith and to deal fairly with each other, but concedes that a claim for breach of contract subsumes any accompanying claim for breach of implied duties.  According to plaintiff, that implied duty imposed on KeyCorp an obligation to use reasonable efforts to enhance the revenues of ACM because Ohio law imposes an obligation on a purchaser to use reasonable efforts to bring

---

[13] Citing Section 11.8 of the PSA, KeyCorp argues in support of its motion to dismiss that the express language of that section provides KeyCorp with the absolute and unrestricted right to operate ACM as KeyCorp saw fit following acquisition, notwithstanding the effect such decisions might have on ACM's net revenues or the amount of Contingent Consideration potentially due plaintiffs.  In light of the express contract language of Section 11.8, defendant contends that any claim by plaintiff that KeyCorp had a duty to operate ACM in any particular way must fail as a matter of law.

15

(1:11 CV 1150)

revenues into existence in sales contracts with earn-out provisions, and that a purchaser breaches

its implied duties to a seller when a purchaser acts with ulterior economic motives to reduce or

deny a seller's earn-out payments, which plaintiff alleges was KeyCorp's motive in liquidating

ACM's funds during the Measurement Period.

Further, plaintiffs opposes KeyCorp's argument that Counts 2 and 3 should be dismissed

as contrary to the express language of Section 11.8 of the PSA.  Plaintiffs dispute that Section

11.8 gives KeyCorp absolute authority with respect to ACM, and argues that the language of

Section 11.8 only pertains to extra-contractual representation, warranties, statements and

agreements by KeyCorp relative to ACM's operation and does not negate KeyCorp's implied

duties under Ohio contract law.  Second, plaintiffs argue that the liquidation of ACM's funds

during the Measurement Period was not contemplated by the parties at the time of drafting, and

that language of Section 11.8 does not specifically address that issue.  In any event, it is

plaintiffs' position that the language of Section 11.8 is subject to interpretation and is at least

ambiguous with respect to whether KeyCorp had the contractual right to liquidate ACM's funds

during the Measurement Period.  Plaintiff also alleges that the meaning of "material adverse

effect" in the PSA is ambiguous.

B.      Plaintiffs' Motion to Strike or Dismiss KeyCorp's Counterclaims

Plaintiffs have moved pursuant to Rules 12(b)(6) and 12(f) of the Federal Rules of Civil

Procedure on the grounds that KeyCorp's claims 1 through 3 for declaratory judgment are

duplicative and merely restate issues already before the Court, and because claim 4 for

declaratory judgment is in direct contradiction of the PSA.  Defendant has opposed the motion

16

(1:11 CV 1150)

on the grounds that KeyCorp has pled valid counterclaims that go beyond the scope of the

complaint.

## IV.  LAW AND ANALYSIS

A.      <u>Rule 12 Motions</u>

      1.      *Rule 12(b)(6)*

The parties have filed cross-motions to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6).  The Court may grant a motion to dismiss when the claims, which are the

subject of the motion, fail to state a claim upon which relief may be granted.

When considering a motion to dismiss, the Court must assume well-pleaded factual

allegations as true, but need not accept conclusory allegations in the pleading as true.  Only

facts alleged in the pleadings and documents attached as exhibits to the pleadings.[14]  In addition,

when documents are referred to in the pleadings and are integral to the claims, then the

documents may be considered with respect to a motion to dismiss without converting a motion to

dismiss into a motion for summary judgment.  *Commercial Money Center, Inc. v. Illinois Union*

*Ins. Co.*, 508 F.3d at 335-36 *; Weiner v. Klais and Co.,* 108 F.3d 86, 89 (6th Cir. 1997)

(documents attached to a motion to dismiss are considered part of the pleadings if referred to in

plaintiff's complaint and central to plaintiff's claim).  In this case, the Court may consider the

PSA between the parties, which is attached to defendant's motion to dismiss and is central to

---

[14] Documents attached to the pleadings become part of the pleadings and may be
considered on a motion to dismiss without converting a Rule 12 motion to a motion for summary
judgement. *Commercial Money Center, Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335-36 (6th
Cir. 2007)(citing Fed. R. Civ. P. 10(c)).

(1:11 CV 1150)

plaintiffs' claims, without converting the motions to dismiss into motions for summary

judgment.

In order to survive a motion to dismiss, the claims in the pleading must contain sufficient

factual matter, which if accepted to be true, states a claim for relief that is plausible on its face.

The plausibility requirement requires more than a sheer possibility that the defendant acted

unlawfully. *Ashcroft v. Iqbal,* 120 S.Ct. 1937, 1949-51 (2009); *Bell Atlantic v. Twombly*, 550

U.S. 544, 570 (2007). 550 U.S. 544, 570 (2007). Dismissal of claims in plaintiff's complaint is

appropriate if plaintiff fails to state a claim upon which relief can be granted.

> 2. *Rule 12(f)*
>
> > **Motion to Strike**. The court may strike from a pleading an
> > insufficient defense or any redundant, immaterial, impertinent,
> > or scandalous matter.

B.     28 U.S.C. § 2201 *et seq.* (Declaratory Judgment Actions)

KeyCorp's counterclaims seek various declarations from the Court pursuant to

28 U.S.C. § 2201 *et seq.* The Court's exercise of jurisdiction over declaratory judgment actions

is discretionary. In deciding whether to exercise jurisdiction over a declaratory judgment claim,

the Sixth Circuit has adopted a five-factor test:[15]

> > (1) whether the judgment would settle the controversy; (2) whether the
> > declaratory judgment action would serve a useful purpose in clarifying the legal
> > relations at issue; (3) whether the declaratory remedy is being used merely for the
> > purpose of "procedural fencing" or "to provide an arena for a race for res
> > judicata"; (4) whether the use of a declaratory action would increase the friction

---

[15] *U.S. Fire Ins. Co. v. Albex Aluminum, Inc.,* 161 Fed. Appx. 562, 564 (6th Cir. 2006)(citing *Grand Trunk Western Co. v. Consolidated Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)).

18

(1:11 CV 1150)

> between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective.

C.    Ohio Contract Law

Section 11.2 of the PSA provides that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Ohio without giving effect to the principles of conflict of laws thereof."  Accordingly, the Court will apply the laws of the State of Ohio to the parties' dispute over the PSA, which is the subject of both the complaint and counterclaim, and at the core of the parties' motions to dismiss.

Ohio law imposes an implied duty of good faith on the parties to a contract.  *Wendy's International, Inc. v. Saverin*, 337 Fed. Appx. 471, 476 (6th Cir. 2009)(citing *Ed Schory & Sons, Inc. v. Francis,* 75 Ohio St. 2d 433, 666 N.E.2d 1074, 1082-83 (1996)); *Agilysys, Inc. v. Gordon,* 2008 WL 5188278 at * 10 (N.D. Ohio) (quoting *Thomas & Maker Constr. Co. v. Wal-Mart Stores, Inc.,* 2008 WL 4279860 (S.D. Ohio Dept. 15, 2008) (citing *Littlejohn v. Parrish,*163 Ohio App. 3d 456, 839 N.E.2d 49, 54 (Ohio Ct. App. 2005))).  However, that duty of good faith and fair dealing does not create an independent cause of action.   *Wendy's International, Inc. v. Saverin*, 337 Fed. Appx. at 476-77 (citing *Thomasville Furniture Indus., Inc. v. JGR Inc.,* 3 Fed. Appx. 467, 472 (6th Cir. 2001)(quoting *Bolling v. Clevepak Corp.,* 20 Ohio App. 3d 113, 484 N.E. 2d 1367, 1376 (1984))); *Agilysys, Inc. v. Gordon,* 2008 WL 5188278 at * 10 (quoting *Thomas & Maker Constr. Co. v. Wal-Mart Stores, Inc.,* 2008 WL 4279860 (citing *Littlejohn v. Parrish,*163 Ohio App. 3d 456, 839 N.E.2d at 54)).

(1:11 CV 1150)

The implied covenant of good faith and fair dealing is "implicated by acts or omissions '*that could not have been contemplated at the time of drafting*,' and which therefore were not resolved explicitly by the parties.'" *Wendy's International, Inc. v. Saverin*, 337 Fed. Appx. at 477 (emphasis in original)(quoting *Ed Schory & Sons, Inc. v. Francis,* 75 Ohio St. 2d 433, 666 N.E.2d at 1082-83 (emphasis added)); *Agilysys, Inc. v. Gordon,* 2008 WL 5188278 at * 10 (quoting *Thomas & Maker Constr. Co. v. Wal-Mart Stores, Inc.,* 2008 WL 4279860 (quoting *Ed Schory & Sons, Inc. v. Francis,* 75 Ohio St. 2d 433, 666 N.E.2d 1074 (1996))).  The implied covenant of good faith and fair dealing does not apply to enlarge existing contractual terms or create new contractual terms between the parties,[16] to create an obligation inconsistent with the express terms of the agreement,[17] or where a party has absolute authority to make the decision at issue.[18]

D.    Analysis

1.    *Defendant's Motion to Dismiss Counts 2 and 3 of Plaintiffs' Complaint*

KeyCorp has moved to dismiss Counts 2 and 3 of the complaint on the grounds that breaches of implied duties of good faith are not separate causes of action under Ohio law. Plaintiff concedes that Ohio law does not recognize an independent cause of action for breach of

_____

[16] *Agilysys, Inc. v. Gordon,* 2008 WL 5188278 at * 10-11 (citations and quotations omitted).

[17] *Adams v. LCI International Telecom Corporation,* 2000 WL 1006043 at * 2 (Ohio App. 10 Dist.).

[18] *Davco Acquisition Holding, Inc. v. Wendy's International*, 2008 WL 755283 at * 6-7 (S.D. Ohio) (obligation of good faith and fair dealing is not an invitation to the court to decide whether a party ought to have exercised a privilege expressly reserved in the document).

20

(1:11 CV 1150)

an implied duty of good faith that is separate from a claim for breach of contract where a

contract exists that governs the relationship between the parties.  *Agilysys, Inc. v. Gordon,* 2008

WL 5188278 at * 10.

Plaintiffs have asserted a breach of contract claim in connection with payment of the

Contingent Consideration under the PSA in Count 1.  Count 1 is not the subject of a motion to

dismiss by KeyCorp.

The complaint is somewhat confusing in that Counts 2 and 3 are separately captioned as

breach of contract claims, however, the breach alleged in those counts are those of KeyCorp's

implied covenants and duties.  In their opposition to defendant's motion to dismiss, plaintiffs

argue that because Counts 2 and 3 are captioned "breach of contract," the allegations of breach

of implied covenants and duties in Counts 2 and 3 are in fact, breach of contract claims which

have simply been separated out into express and implied claims.  If the Court does not agree with

that characterization, plaintiffs have requested leave to re-plead these claims under Count 1 for

breach of contract.  KeyCorp opposes plaintiffs' request to amend their complaint on the grounds

that an amendment would be futile because Section 11.8 of the  PSA expressly disclaims the

implied duties alleged by plaintiffs.

Because of the somewhat confusing manner in which plaintiffs captioned and pled the

express and implied claims, it is a close call as to whether plaintiffs have actually pled

stand-alone claims for breach of the implied covenants of good faith and fair dealing.  For that

reason, defendant's motion to dismiss Counts 2 and 3 on the grounds that plaintiffs have pled

(1:11 CV 1150)

their claims for breach of implied duties as independent causes of action is DENIED.  However,

plaintiffs are ordered to file the amended complaint for which they requested leave by

February 24, 2012.

Defendant's alternative argument in support of the Rule 12(b)(6) motion for failure to

state a claim upon which relief can be granted is that the implied duties alleged by plaintiffs are

contradictory to the express language of Section 11.8 of the PSA, which therefore requires

Counts 2 and 3 to be dismissed as a matter of law.  However, plaintiffs allege in the complaint

that the language of Section 11.8 does not specifically address, and is ambiguous with respect to,

KeyCorp's authority to operate ACM, and in particular, KeyCorp's authority to liquidate ACM's

funds during the Measurement Period.

When considering a motion to dismiss, the Court must accept the plaintiffs' well-pleaded

allegations as true.  In this case, the Court does not find plaintiffs' allegations regarding the

meaning or ambiguity of Section 11.8 to be merely conclusory.  Therefore for the purpose of this

analysis, the Court finds that plaintiffs' allegations regarding KeyCorp's implied duties under the

PSA do not fail to state a claim as a matter of law.

Accordingly, defendant's motion to dismiss on the grounds that plaintiffs' claims

regarding KeyCorp's implied duties under the PSA are negated by the express language of the

PSA is DENIED.

2.      *Plaintiffs' Motion to Dismiss or Strike Defendant's Counterclaim*

In applying the Sixth Circuit's five-factor test to defendants' counterclaims, the Court

finds it is appropriate to exercise jurisdiction over defendant's claims for declaratory judgment.

22

(1:11 CV 1150)

The issues advanced in defendant's counterclaims are not entirely redundant of the breach of contract claims in plaintiffs' complaint, and deciding the counterclaims will both settle the controversy between the parties and clarify the legal relationships between the parties with respect to the PSA and related events at issue in this case. Further, resolution of all parties' claims in a single action will reduce procedural fencing in favor of a complete resolution of the case. The fourth factor is not applicable in this case. With respect to the fifth factor, there are no alternative, more effective, methods of resolution that are apparent at this time.[19]

Accordingly the Court concludes that it is appropriate to exercise jurisdiction over defendant's counterclaims for declaratory judgment. Having determined that defendant's counterclaims are not entirely redundant of the claims in plaintiffs' complaint, plaintiffs' Rule 12(f) motion to strike is DENIED.

Further, it is clear to the Court from the facts alleged by the parties in their pleadings and the responsive briefs to the Rule 12 motions that the parties' views of the meaning of the terms of the PSA are quite different. For the purpose of ruling on plaintiffs' motion to dismiss defendant's counterclaim pursuant to Rule 12(b)(6), the Court must accept defendant's well-pleaded factual allegations as true. On that basis and for the purpose of this analysis, plaintiffs' motion to dismiss for failure to state a claim is DENIED.

---

[19] The Court notes that self-resolution of disputes through mediation is always an alternative method of resolution that is more effective than judicial resolution. It is apparent to the Court that mediation at this time may not be possible. However, if in the future the parties jointly wish to pursue an alternative form of dispute resolution, they should so notify the Court.

(1:11 CV 1150)

## V.  CONCLUSION

For the reasons contained herein, defendant's motion to dismiss Counts 2 and 3 of plaintiffs' complaint is DENIED.  Plaintiffs are directed to file an amended complaint in accordance with this Order by February 24, 2012.

Further for the reasons contained herein, plaintiffs' motion to dismiss or strike defendant's counterclaims is DENIED.

Because the Court has already ruled on the parties' Rule 12 motions on substantive grounds, the Court will not entertain additional motions to dismiss from either side. This case is presently the subject of a case management plan, which remains in effect. *See* ECF 22.

IT IS SO ORDERED.


  February 16, 2012                         s/ David D. Dowd, Jr.
Date                                      David D. Dowd, Jr.
                                          U.S. District Judge

24